# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS LOUIS POPKE,<br><br>   Petitioner,<br><br>   v.<br><br>CHANCE ANDES,<br><br>   Respondent. | Case No. 1:24-cv-00779-JLT-EPG-HC<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner Douglas Louis Popke is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons discussed herein, the undersigned recommends denial of the petition for writ of habeas corpus.

## I.

## BACKGROUND

On March 25, 2022, Petitioner was convicted by a jury in the Mariposa County Superior Court of attempted first-degree murder of a peace officer (count 1) with a personal discharge of a firearm enhancement and assault with an assault weapon on a peace officer (count 2) with a personal use of a firearm enhancement. (2 CT[1] 381–82.) On August 30, 2022, Petitioner was sentenced to an imprisonment term of fifteen years to life on count 1 plus twenty years on the associated personal discharge of a firearm enhancement. (2 CT 429.) On December 28, 2023, the

---
[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on May 29, 2025. (ECF No. 25.)

1

1  California Court of Appeal, Fifth Appellate District, ordered Petitioner's sentence on count 2 and
2  the associated use of a firearm enhancement stayed, directed the trial court to prepare an
3  amended determinate abstract of judgment so reflecting, and otherwise affirmed the judgment.
4  People v. Popke, No. F084966, 2023 WL 8947160, at *14 (Cal. Ct. App. Dec. 28, 2023), as
5  modified on denial of reh'g (Jan. 12, 2024). On March 12, 2024, the California Supreme Court
6  denied the petition for review. (LDs[2] 19, 20.)
7  On July 2, 2024, Petitioner filed the instant petition for writ of habeas corpus raising the
8  following claims for relief: (1) ineffective assistance of counsel; (2) prosecutorial misconduct;
9  and (3) sufficiency of the evidence. (ECF No. 1 at 8–11.[3]) On March 12, 2025, the Court
10 dismissed the unexhausted ineffective assistance of counsel and prosecutorial misconduct claims.
11 (ECF No. 17.) On June 4, 2025, Respondent filed an answer. (ECF No. 26.) On June 18, 2025,
12 Petitioner filed a traverse. (ECF No. 27.)

## II.

## STATEMENT OF FACTS[4]

**I. A Sheriff's Deputy Goes to Appellant's Residence to Attempt to Serve him with Court Documents. Appellant Responds by Shooting at the Deputy with an Assault Rifle.**

On the evening of August 28, 2020, Mariposa County Sheriff's Deputy Jose Garcia was tasked with serving appellant with court documents.[5] Service of court documents was part of his regular duties as a deputy sheriff. At the start of his shift, Garcia's sergeant provided him with the court documents, along with a "trip ticket," which included appellant's identifying information. The trip ticket was marked "rush," meaning it needed to be served as soon as possible. The trip ticket also stated appellant worked Monday through Friday, and that service at his residence should be attempted after 5:00 p.m.

Garcia drove to appellant's residence in a fully marked patrol vehicle with a sheriff's logo on the side and a light bar on top. He wore a fully marked uniform, including a badge and a hat with a sheriff's logo. He reached appellant's property at approximately 7:30 p.m. Garcia testified there was still plenty of light outside when he arrived.

Appellant lived on a five-acre parcel in rural Mariposa County. The residence was in the center of the parcel and not visible from the street. An approximately 400-

---

[2] "LD" refers to the documents lodged by Respondent on May 29, 2025. (ECF No. 25.)
[3] Page numbers refer to the ECF page numbers stamped at the top of the page.
[4] The Court relies on the California Court of Appeal's December 28, 2023 opinion for this summary of the relevant facts. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).
[5] The nature of the court documents was not revealed to the jury.

yard dirt driveway led from the street to the residence. There was a rustic metal gate about 150 yards up the driveway, connected to wire fencing that enclosed a large portion of the parcel. Signs posted near the gate read: "No Trespassing," "Keep Out," and "Nothing In Here is Worth Dying For."

Garcia drove his patrol vehicle up the driveway and stopped at the gate. The gate was closed and appeared to be locked with a chain and padlock. Upon closer inspection, Garcia observed the gate was "dummy-locked," meaning it was secured with a chain and padlock, but not actually locked. Garcia took off the lock, unwrapped the chain, and opened the gate. He then got back into his patrol car and drove through the gate. He did not close the gate behind him. He continued another 200 yards up the driveway and parked near appellant's residence.

Before Garcia exited his patrol vehicle, he activated his body-worn camera, which captured his interactions with appellant. A copy of the video was admitted into evidence and played for the jury.

Garcia testified that as he approached the residence, he observed the area around the front door was blocked with "[a] cluttered mess." For this reason, he did not believe the front door was the commonly used entrance and exit to the house. He walked down the dirt driveway, which went along the left side of the house to the back. The driveway was not obstructed by a gate or any other obstacle. He observed the back door to the residence was not blocked with items, and concluded it was likely the commonly used entrance. He explained it was common in Mariposa County for people to use the back door as the main door to the house.

Garcia knocked on the back door and announced, "Hello, Sheriff's Office." After a few moments, appellant answered the door and stepped outside, saying, "There he is." Garcia stated, "Sheriff's Office, how you doing sir? Are you uh Douglas ...." Appellant interrupted Garcia, stating, "No. What are you doing partner?" Garcia tried to explain that he was there to serve court documents, but appellant interrupted him again, stating, "You came through my god damn gate, it was locked." Garcia responded, "[H]ang on. It was not locked," but appellant went back inside of his house, stating, "No, no, no, no, you came through." Garcia remained outside, and advised appellant, "I'm going to leave paperwork here for you."

Garcia testified he was planning to leave but became suspicious when he heard appellant moving around inside of the residence "with a purpose ... with an intent." He also heard a woman's voice say, "Where are you going? What are you doing? What's going on?" This caused Garcia to become concerned appellant had gone into the house to retrieve a firearm. Garcia drew his service pistol and held it pointing down at "low ready" and waited at the back corner of the house.

Soon after, appellant exited through the front door of his residence holding an AR-style assault rifle. He stepped around the front corner of the house and stood between Garcia and his patrol car, approximately 30-40 feet from Garcia. Appellant held the assault rifle with his right hand, with his hand on the pistol grip and the barrel pointed down. He pointed at Garcia's patrol car with his left hand and yelled something that Garcia could not make out. Garcia described appellant's demeanor as hostile and angry.

Garcia pointed his service pistol at appellant and yelled, "Hang on, stop. Put the

3

gun down." Appellant dropped his left hand down to the rifle and began to raise the barrel toward Garcia. Garcia believed appellant was going to shoot him, so he fired three shots at appellant. One of the shots struck the charging handle of appellant's assault rifle, then ricocheted into his right shoulder.

While Garcia was firing the three shots, appellant began shooting at Garcia. Garcia immediately retreated behind the back corner of the house, leaning out twice to return fire. Appellant continued to shoot at Garcia as he hid behind the corner of the house. Two of the rounds went through the house and exited in front of Garcia's face.

Recognizing appellant was armed with a superior weapon capable of shooting through cover, Garcia elected to retreat. He could also see that appellant was advancing toward him. Garcia turned and ran past the back door and across the back porch. While Garcia was fleeing, appellant fired at least five additional shots with the assault rifle. As he stepped off of the back porch, Garcia lost his balance and fell, but was able to get to his feet and continue to run.

Garcia ran across appellant's property and climbed over multiple fences, two of which were electrified. He eventually stopped at the residence of one of appellant's neighbors and used the neighbor's landline to call for backup. He checked over his body and confirmed he had not been shot.

After additional officers arrived on scene, appellant's adult son called 911 and stated appellant had locked himself inside of a shipping container on appellant's property. A law enforcement "special response team" identified the shipping container and called for appellant to come out over a loudspeaker, which he eventually did. As appellant was taken into custody, he asked "how that fat cop that he shot was doing."

**II. Crime Scene Evidence.**

Inside of the shipping container, officers recovered the rifle appellant used to shoot at Garcia—a .300 Blackout AR-style rifle. A firearms expert examined the rifle and opined it constitutes an assault weapon under California law. Officers located several other firearms inside the shipping container, including an additional AR-style rifle.

At the scene of the shooting, there were 13 expended .300 blackout cartridge casings and six expended nine-millimeter cartridge casings. A firearms expert examined the casings and opined that the .300 blackout casings were fired by appellant's assault rifle, and the nine-millimeter casings were fired by Garcia's service pistol. The pattern of the .300 blackout casings on the ground suggested appellant advanced toward the back corner of the house as he was firing the assault rifle.

Law enforcement personnel observed several bullet holes in the back corner of appellant's residence. They also observed a bullet entrance hole and exit hole in a plastic garbage can on appellant's back porch. The garbage can was located along the path Garcia took as he fled across the back porch and away from appellant. The location of the holes was consistent with appellant having shot at Garcia as he ran away. A firearms expert used appellant's assault rifle to fire a test shot through the garbage can. The resulting bullet hole matched the initial bullet holes discovered by law enforcement personnel.

4

**III. Testimony of Other Witnesses.**

The People called an expert in police practices, use of force, and digital media evidence. Based on his review of the video from Garcia's body-worn camera, the expert opined that Garcia was justified in using deadly force when appellant raised the barrel of his assault rifle toward him, and under the circumstances, Garcia had no reasonable alternative to using deadly force.

Appellant's neighbor testified he was in his home when he saw a police officer run across his front yard. He went outside and saw appellant near the fence line of his property holding an AR-style assault rifle. When he asked appellant what was going on, appellant told him, "A cop shot me," and "I'm looking for that fat cop."

Another of appellant's neighbors testified he has had conversations with appellant about law enforcement coming onto his property. During one of those conversations, appellant stated that if law enforcement came through his gate and to his house, "there might be a confrontation." Prior to trial, in a statement to law enforcement, the neighbor stated appellant "had planned this exact incident," and that appellant told him he "would use firearms against law enforcement if they ever came to his property."

**IV. Appellant's Statements and Testimony.**

Appellant was transported to the hospital for treatment for his gunshot wound. When a member of the emergency room staff told appellant that if he had been shot in the center of the chest, "there would not have been much left of him," appellant responded, referring to Garcia, "Wouldn't be much left of him." A minute later, appellant stated, referring to law enforcement: "They are pussies. Use nine-millimeter. He's just lucky I didn't pull a fucking .45 on him."

Appellant was interviewed by law enforcement the following day. He admitted he "screwed up bad," and that the judge can do "[w]hatever [he] wants to do to me." However, he continued to insist that Garcia should not have gone through his gate, which he repeatedly claimed was locked. He stated that Garcia did not give him the opportunity to drop his rifle, and after Garcia shot him, he went "ballistic." He felt he had to "take him out," and tried to hit Garcia by shooting through the corner of his house because he knew his "bullets go through wood." He moved forward toward the corner of the house while he was shooting because he was "trying to get another angle on him." He saw Garcia take off "like a rabbit" and fall after he ran across the back porch. He denied shooting at Garcia as he ran away.

At trial, appellant testified he was 69 years old when the shooting occurred. On the evening of the shooting, he was at home with his wife and adult son. He thought he had locked the driveway gate earlier that day. He testified he usually kept the gate locked at night for safety reasons, but sometimes he only left it dummy locked.

Appellant testified that sometime after dinner, while he was in his office, he heard his wife say that someone was at the back door. He opened the door and saw a person wearing plain clothes with a gun on his hip. He did not see a uniform or a badge. He was concerned because the person came through the gate, which he believed was locked. He confronted the person about coming through the gate, then went into his house and armed himself with the assault rifle. The rifle was

5

> loaded with "fragmentation rounds," which appellant acknowledged were designed to "inflict maximum damage" on living things.
>
> As appellant exited his front door, he saw a patrol car parked in the driveway, and realized the person at his house was a deputy sheriff. He testified the deputy pointed his pistol at him and ordered him to drop his rifle, but that the deputy started shooting before he was able to comply. He claimed he returned fire because he thought the deputy was going to kill him. He continued to shoot as he moved toward the deputy, but denied shooting at him as he fled across the back porch.
>
> After the shooting, appellant went to his shipping container and obtained a different rifle because one of the deputy's bullets struck and damaged his original rifle. He went to his driveway gate, which was open, and closed and locked it, then went toward his neighbor's property to look for the deputy. After speaking with his neighbor, he went back to his shipping container to "bleed out." He denied that he intended to murder the deputy, or that he had planned out his interaction with law enforcement that day.

Popke, 2023 WL 8947160, at *1–4 (footnote in original).

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged convictions arise out of the Mariposa County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

///

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Davis v. Ayala, 576 U.S. 257, 268–69 (2015); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. Ayala, 576 U.S. at 269. However, if the state court did not reach the merits of the claim, the claim is reviewed *de novo*. Cone v. Bell, 556 U.S. 449, 472 (2009).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA and the Court must defer to the state court's decision. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125, 123 (2008)).

If the Court determines there is clearly established Federal law governing the issue, the Court then must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an unreasonable application of[] clearly established Federal law" if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state

court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

If the Court determines that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," and the error is not structural, habeas relief is nonetheless unavailable unless it is established that the error "had substantial and injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

AEDPA requires considerable deference to the state courts. Generally, federal courts "look through" unexplained decisions and review "the last related state-court decision that does provide a relevant rationale," employing a rebuttable presumption "that the unexplained decision adopted the same reasoning." Wilson v. Sellers, 584 U.S. 122, 125 (2018). This presumption may be rebutted "by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." Id.

"When a federal claim has been presented to a state court[,] the state court has denied relief," and there is no reasoned lower-court opinion to look through to, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. Where the state court reaches a decision on the merits and there is no reasoned lower-court opinion, a federal court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the record is not *de novo* review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court record and "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that

those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

## IV.

## DISCUSSION

In his sole remaining claim for relief, Petitioner asserts that the evidence presented at trial was constitutionally insufficient to support a conviction for attempted premeditated murder of a peace officer because Deputy Garcia's conduct was not within the lawful scope of his duties at the time of the incident. (ECF No. 1 at 5, 10–11; ECF No. 27 at 1–2.) This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claims in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. As federal courts "look through" summary denials and review "the last related state-court decision that does provide a relevant rationale," Wilson, 584 U.S. at 125, this Court will examine the decision of the California Court of Appeal.

In denying Petitioner's sufficiency of the evidence claim, the California Court of Appeal stated:

> **I. The Jury's Finding that Garcia was Lawfully Performing his Duties as a Sheriff's Deputy was Supported by Substantial Evidence.**
>
> Attempted murder of a peace officer and assault with an assault weapon on a peace officer both include the element that the victim was a peace officer engaged in the lawful performance of his or her duties. (§§ 664, subd. (e), 245, subd. (d)(3).) Appellant claims the record contains insufficient evidence of this element because Garcia violated his Fourth Amendment rights by coming onto his property through the dummy-locked gate and approaching the back door of his house. Respondent contends that appellant conceded that Garcia's conduct was lawful by failing to object to the trial court's instruction that a peace officer "may legally enter private property" to effectuate service. We reject respondent's contention that the element was conceded, but conclude the record conclusively establishes Garcia's conduct was reasonable under the Fourth Amendment, and therefore appellant's convictions were supported by substantial evidence.
>
> **A. Background.**
>
> In their motions in limine, the People requested the trial court instruct the jury that a deputy sheriff has "the legal right and duty to enter private property to serve valid court process at any time of the day or night," and that it is "not a defense ... that the deputy entered a closed gate onto private property." Appellant filed a response arguing the court should instead instruct the jury that a deputy may only attempt to effectuate service "at a reasonable time and in a reasonable manner."

During oral argument, defense counsel agreed that "a deputy sheriff has a right and a duty to serve process on private property," and stated he was not arguing Garcia had committed criminal trespass. Instead, defense counsel clarified he was requesting the court instruct the jury that "it's up to them to determine if the sheriff was exercising reasonable speed, diligence, time, and in a reasonable manner."

The court concluded that it would consider both proposed instructions, draft its own version of the instruction, and discuss it with the parties. The court noted, however, that the instruction would include language that " '[t]he deputy has a right and duty to serve process, which includes the right to enter on to private property through a closed gate,' or something like that." When asked if that would "work" for him, defense counsel responded, "[s]ubmitted."[6]

After the close of evidence, the trial court held a jury instructions conference with the parties off the record. Once back on the record, defense counsel stated he had no objection to the trial court's proposed instructions.

As pertinent here, the trial court gave the following jury instructions: "A Mariposa County Deputy Sheriff is a peace officer;" "The duties of a Deputy Sheriff include service of civil process;" and, "A peace officer may legally enter private property to serve, or attempt to serve, civil papers or orders issued by any court."

### B. Standard of review.

Attempted murder of a peace officer includes the element that the victim was a peace officer engaged in the lawful performance of his or her duties. (§ 664, subd. (e); *In re Manuel G.* (1997) 16 Cal.4th 805, 815; CALCRIM No. 602.) Assault with an assault weapon on a peace officer includes the same element. (§ 245, subd. (d)(3); CALCRIM No. 860.) "California cases hold that although the court, not the jury, usually decides whether police action was supported by legal cause, disputed facts bearing on the issue of legal cause must be submitted to the jury considering an engaged-in-duty element, since the lawfulness of the victim's conduct forms part of the corpus delicti of the offense." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1217.)

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) We "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "We need not be convinced of the defendant's guilt beyond a reasonable doubt; we merely ask whether ' "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.)

---

[6] After motions in limine were argued and the jury was sworn, the trial court declared a mistrial because appellant was quarantined due to COVID exposure, and a witness tested positive for COVID. The parties agreed that the trial court's previous rulings would carry over to the next trial.

10

### C. Appellant did not concede the element that Garcia was lawfully performing his duties as a peace officer.

We begin by addressing respondent's argument that appellant conceded that Garcia was lawfully performing his duties by failing to object to the instruction that a peace officer "may legally enter private property" to effectuate service. Respondent contends that, due to this instruction, "there were no disputed issues of fact for the jury to decide" on the issue of lawful performance.

We reject the premise of respondent's argument that the jury instruction removed the lawful performance element from the jury's consideration. Lawful performance is an element the People were required to prove, and appellant did not stipulate to the truth of that element. The jury was instructed as to each offense that to convict appellant it must find beyond a reasonable doubt that Garcia was lawfully performing his duties as a peace officer. The instruction that a peace officer "may legally enter private property" to effectuate service merely provided the jury with guidance on the law—namely, what a peace officer may lawfully do while serving or attempting to serve civil process. It did not resolve all factual disputes and establish the lawful performance element as a matter of law. The jury was still required to determine whether Garcia's conduct was otherwise lawful. Ultimately, the element of lawful performance was decided by the jury, and the question of whether the jury's finding was supported by sufficient evidence is properly subject to our review. (See *Jackson v. Virginia* (1979) 443 U.S. 307, 316–319 [due process guarantees all criminal conviction be supported by sufficient evidence].)

### D. Substantial evidence supported the jury's finding that Garcia's conduct was lawful.

Appellant's sufficiency of the evidence claim is based solely on his assertion that Garcia's entry onto his property violated the Fourth Amendment. Appellant does not suggest that Garcia violated any California statutory law. Indeed, California law authorizes sheriff's deputies to enter private property to effectuate service. The Penal Code expressly exempts sheriff's deputies involved in service of process from criminal statutes prohibiting trespass on private property. (See, e.g., § 602, subd. (n) [excluding any sheriff who drives a vehicle upon the real property of another to effectuate service]; § 602.8, subds. (a), (c)(3) [excluding any sheriff who enters lands "enclosed by fence" or "where signs forbidding trespass are displayed" to effectuate service]; see also Gov. Code, § 26608 ["The sheriff shall serve all process and notices in the manner prescribed by law."].)

Under the Fourth Amendment, Garcia's entry onto appellant's property was unlawful if it was a "governmental intrusion upon ... an area in which he has a reasonable expectation of privacy." (*People v. Mayberry* (1982) 31 Cal.3d 335, 341.) Appellant asserts that Garcia violated his Fourth Amendment rights by opening the gate onto his property and approaching his house from the back door.

We disagree. "Our Supreme Court has made clear that a police officer who makes an uninvited entry onto private property does not per se violate the occupant's Fourth Amendment right of privacy. The criterion to be applied is whether entry is made into an area where the public has been implicitly invited, such as the area furnishing normal access to the house. A reasonable expectation of privacy does not exist in such areas." (*In re Gregory S.* (1980) 112 Cal.App.3d 764, 775, citing *Lorenzana v. Superior Court* (1973) 9 Cal.3d 626; see also *United States v. Reed* (8th Cir. 1984) 733 F.2d 492, 501 ["no Fourth Amendment search occurs when

police officers who enter private property restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways"].)

Here, Garcia used normal access routes to attempt to contact and serve appellant. He opened an unlocked gate, parked his patrol car in the driveway, walked along the unobstructed driveway to what he believed was the commonly used door to the house, and knocked. His actions were consistent with that of a private citizen attempting to contact the occupants of appellant's residence. He "exercised no more than ' "the same license to intrude as a reasonably respectful citizen" '—any door-to-door salesman would reasonably have taken the same approach to the house." (*People v. Lujano* (2014) 229 Cal.App.4th 175, 184.)

Appellant argues that Garcia approaching and knocking on the back door of the house rather than the front door was unreasonably intrusive. But on the record before this court, Garcia's decision to try the back door was reasonable. Garcia testified that the area around the front door was blocked with clutter. Garcia's body-worn camera footage, and the photographs admitted into evidence, confirm this observation. Conversely, the back door was easily accessible from the driveway, which provided a clear, unobstructed path around the side of the house to the back. As Garcia explained, in his experience it was common for people in Mariposa County to utilize the back door as the common entrance. Thus, it was reasonable for Garcia to conclude that the back door, rather than the front door, was the commonly used entrance to the house. By proceeding to and knocking on the back door, Garcia did not intrude upon an area where appellant had a reasonable expectation of privacy.

We are also unpersuaded that Garcia's opening of an unlocked gate to attempt to contact appellant was an unreasonable intrusion under the Fourth Amendment.[7] The unlocked gate was along the driveway, an area providing normal access to the house and generally made accessible to visitors. (*In re Gregory S., supra*, 112 Cal.App.3d. at p. 775; *United States v. Reed, supra*, 733 F.2d at p. 501.) Under these circumstances, Garcia's entry through the unlocked gate did not implicate a reasonable expectation of privacy. (See *United States v. Robbins* (8th Cir. 2012) 682 F.3d 1111, 1115 ["We have held that police entry through an unlocked gate on a driveway to approach the front door of a residence for a 'knock-and-talk' is a reasonable, limited intrusion for legitimate law enforcement objectives."]; *People v. Lujano, supra*, 229 Cal.App.4th at p. 184 [officers entering a driveway and passing through two unlocked gates to attempt to initiate consensual contact with the occupants was not an unreasonable intrusion under the Fourth Amendment]; see also *Vickery v. Superior Court* (1970) 10 Cal.App.3d 110, 119 ["If in the course of his proper duties as a police officer, that officer is required to make an investigation at a private home, it would seem an unreasonable deterrent to the public's interest in that investigation, that it can be precluded by the mere existence of an unlocked gate."].)

Appellant's reliance on *People v. Winters* (1983) 149 Cal.App.3d 705 (*Winters*) is unavailing. There, officers went to the appellant's residence to attempt to contact his son about an unrelated criminal matter. (*Id.* at p. 707.) After approaching the

---

[7] While appellant characterizes the gate as "apparently locked," it is clear from the record that the gate was in fact not locked. Garcia testified the gate was unlocked, and appellant testified that after the shooting, he closed the gate and locked it, foreclosing any suggestion that Garcia damaged the lock to open the gate.

12

> front door and discovering no one was home, the officers went through an unlocked gate into the back yard "to investigate," and discovered marijuana plants. (*Id.* at pp. 707–708.) The court held the entry into the backyard violated the Fourth Amendment, reasoning that once the officers determined no one was inside, "their official business at Winters' home ended," and they were not otherwise justified in entering the backyard. (*Id.* at p. 708.) Here, unlike the officers in *Winters*, Garcia never departed from normal access routes to the home that are generally made accessible to visitors. Rather, Garcia entered appellant's property through an unlocked gate solely to attempt to contact appellant by knocking on his door. He did not do anything other than what one would reasonably expect an ordinary visitor to a house would do. (See *People v. Lujano, supra*, 229 Cal.App.4th at p. 184.)
>
> In his reply brief, appellant raises the related claim that the jury should have been instructed that a dummy-locked gate is the same thing as a gate that is actually locked "for Fourth Amendment purposes." Appellant did not request this instruction below, and therefore, it is forfeited. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 877 ["failure to request clarifying language forfeits the issue on appeal"]; *People v. Buenrostro* (2018) 6 Cal.5th 367, 428; *People v. Hardy* (2018) 5 Cal.5th 56, 91.) In any event, appellant provides no authority to support this claim, and it is contradicted by the authorities discussed above.
>
> The evidence at trial was overwhelming that Garcia's conduct was lawful, and that he did not violate appellant's Fourth Amendment rights. Accordingly, the jury's finding that Garcia was engaged in the lawful performance of his duties as to counts 1 and 2 was supported by substantial evidence, and this claim lacks merit.

Popke, 2023 WL 8947160, at *4–8 (footnotes in original).

The Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. State law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 319).

Jackson "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact

could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 2 (2011). No "particular form of evidence is required to support the Court of Appeal's reasoning or the jury's verdict." Lucero v. Holland, 902 F.3d 979, 992 (9th Cir. 2018). "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." Ngo v. Giurbino, 651 F.3d 1112, 1114 (9th Cir. 2011) (quoting Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995)). "[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Cavazos, 565 U.S. at 2. A federal court's "job under AEDPA is to avoid a 'type of fine-grained factual parsing' that does not accord deference to either jurors or state courts, and instead to survey *any* possible fact in the record that could support, directly or circumstantially, the jury's conviction." Lucero, 902 F.3d at 992 (citing Coleman, 566 U.S. at 655).

"Attempted murder of a peace officer and assault with an assault weapon on a peace officer both include the element that the victim was a peace officer engaged in the lawful performance of his or her duties." Popke, 2023 WL 8947160, at *4. Petitioner contends that Deputy Garcia's conduct was not within the lawful scope of his duties at the time of the incident because Garcia came onto Petitioner's property through the dummy-locked gate and approached the back door, in violation of the Fourth Amendment.

"The Fourth Amendment provides in relevant part that the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" Florida. v. Jardines, 569 U.S. 1, 5 (2013). Although "when it comes to the Fourth Amendment, the home is first among equals," the Supreme Court has recognized an "implicit license [that] typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Jardines, 569 U.S. at 6, 8. "Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" Id. at 8 (quoting Kentucky v. King, 563 U.S. 452, 469 (2011)).

///

> To be clear, it remains permissible for officers to approach a home to contact the inhabitants. The constitutionality of such entries into the curtilage hinges on whether the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the home.
>
> Officers conducting a knock and talk also need not approach only a specific door if there are multiple doors accessible to the public. "[T]he law does not require an officer to determine which door most closely approximates the Platonic form of 'main entrance' and then, after successfully completing this metaphysical inquiry, approach only that door. An officer [initiating] a 'knock and talk' visit may approach any part of the building ... where uninvited visitors could be expected." *United States v. Titemore,* 335 F.Supp.2d 502, 505–06 (D.Vt.2004), *aff'd,* 437 F.3d 251 (2d Cir.2006).

United States v. Perea-Rey, 680 F.3d 1179, 1187–88 (9th Cir. 2012).

The Supreme Court has not decided on "whether a police officer may conduct a 'knock and talk' at any entrance that is open to visitors rather than only the front door." Carroll v. Carman, 574 U.S. 13, 20 (2014). The Ninth Circuit has held that "officers, like other uninvited visitors, [are] permitted to enter [a] property through the unlocked gate to initiate a knock and talk." Sartori v. Cnty. of Los Angeles, 676 F. App'x 680, 683 (9th Cir. 2017). See Valadez v. Cnty. of Los Angeles, No. 2:20-CV-03724-JWH-SKX, 2024 WL 3153207, at *18 (C.D. Cal. June 24, 2024) (finding no Fourth Amendment violation where deputies, while escorting a non-party as he attempted to serve documents on plaintiff, entered curtilage through gate that plaintiff did not recall if she locked and that did not otherwise show signs of forced entry).

The caselaw discussed above indicates that a court could reasonably conclude that Deputy Garcia coming onto Petitioner's property through the dummy-locked gate and walking along an unobstructed driveway and approaching the easily accessible back door of the house (rather than the front door that was blocked by clutter) was lawful. Thus, the state court's ultimate conclusion that the evidence was sufficient to establish that Garcia was engaged in the lawful performance of his duties was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

Accordingly, Petitioner is not entitled to habeas relief on his sufficiency of the evidence claim, and the petition should be denied.

## V.

## RECOMMENDATION

Based on the foregoing, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections, **no longer than fifteen (15) pages, including exhibits**, with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned United States District Court Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **August 29, 2025**           /s/ Erica P. Grosjean
           UNITED STATES MAGISTRATE JUDGE